IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | No. 5:15CR50080-001 |
| | ) | |
| SHILO WATTS | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Comes now the defendant, Shilo Watts, by undersigned counsel, and does hereby respectfully move this Court as to the following: for a sentence of a total of 540 months imprisonment to run concurrently with already imposed state sentences. Defense counsel anticipates that the length of time necessary for the sentencing hearing should not exceed two hours

PRELIMARY CONCLUSION

Shilo Watts was a 5 year old child. He was being watched by his aunt one night. They were sitting on the couch watching television. Shilo felt safe and comfortable with his aunt. His aunt then began kissing him and she stuck his tongue in his mouth. Then she reached under his covers and touched his penis. Shilo was frozen. He didn't know what to do or how to act. Next, his aunt performed oral sex on him. Shilo never received treatment or counseling after this incident, and no one helped him.

Fast forwarding, Shilo was in elementary school. He was waiting in the nurse's station. A grown up male approached him and ordered him to take his pants off. The grown up man touched Shilo's penis. Shilo felt ashamed because it felt good, but he was worried that it should not have. Shilo never received treatment or counseling after this incident, and no one helped him.

Fast forwarding again, Shilo was in his twenty's. He was home with his family. After years of carrying around his shame and worry, he tells members of his family that he is sexually

attracted to young boys.  He has tried to curb his arousal with herbal supplements and medication.  He enlisted in the Navy to serve his country and to separate himself from minors.  He doesn't know what else to do to battle these compulsions.  His family tells him not to act on his thoughts.  Shilo's statements are then dismissed and brushed aside.  Shilo never received treatment or counseling after this incident, and no one helped him.

Shilo Watts now sits in an Arkansas jail awaiting sentencing in Federal Court.  He is already a convicted sex offender in Texas.  Included with this memo is a psychosexual evaluation and risk assessment prepared by Dr. Sam Wallace, identified as Defense Exhibit A.  As noted by Dr. Wallace, Mr. Watts presents a moderate to high risk of reoffending, with a 15.2% recidivism rate.  Under his Violence Risk Appraisal Guides score, his risk of reoffending was 33%.  The sentence requested of 45 years is very severe and is sufficient but not greater than necessary to achieve the goals of sentencing.

PROCEDURAL BACKGROUND

On October 28, 2015, an indictment was filed charging Mr. Watts with three counts of transportation of three different minors with intent to engage in criminal sexual activity in violation of 18 U.S.C. §2423(a), one count of travel with intent to engage in illicit sexual conduct with a minor in violation of 18 U.S.C. §2423(b), and one count of aggravated sexual abuse of a minor in violation of 18 U.S.C. §2241(c).  On November 19, 2015, Mr. Watts appeared for arraignment on the indictment.  On January 6, 2016, Mr. Watts appeared before Honorable Timothy Brooks, U.S. District Judge, for a change of plea hearing.  Mr. Watts formally entered a plea of guilty to Count One of the indictment.  Mr. Watts has been in custody since his arrest on May 15, 2013.  The final presentence report has yet to be filed. Sentencing is scheduled for May 13, 2016.

## FACTS

On October 12, 2012, Homeland Security Investigations (HSI) met with Mr. Watts' nephew, who had reported that Mr. Watts sexually abused him. His nephew alleged that Mr. Watts had also engaged in sexual acts with boys from the Republic of the Marshall Islands (RMI). Agents were able to determine that Mr. Watts lived in the RMI from May 2004 to August of 2008. They also determined that Mr. Watts helped some of the boy in the RMI enter the United States to live with other family members already residing in the U.S.

Regarding the offense of conviction, HSI agents interviewed W.C. on November 28, 2012 and he disclosed that Mr. Watts had started touching him while he lived in the RMI. He also stated that Mr. Watts touched him in 2008 in Springdale, Arkansas. During the course of interviewing several boys from the RMI, it was revealed that Mr. Watts took several trips with multiple RMI boys. The first trip was in 2008, and the RMI boys that went with Watts from Oklahoma and Arkansas to Texas were J.J., A.T., W.C., R.T., J.L., N.K., and an unknown boy from Oklahoma. PSI ¶ 19. During that trip, J.J. reported that Mr. Watts attempted to him. With the exception of W.C., no other RMI reported being abused or attempted abuse close to that time in 2008.

The second trip occurred in 2010. PSI ¶ 20. No abuse was reported by any of the boys in 2010. The third trip occurred in 2012, and the RMI boys that went were J.J., A.T., R.T., and L.J. PSI ¶ 21. On that specific trip, none of the RMI boys reported any abuse or attempted abuse. J.J. reported witnessing Mr. Watts abuse three other minors, PSI ¶ 22, but Mr. Watts denies those allegations. Later in 2012, as reported by S.G. in 2013, PSI ¶ 33, Mr. Watts took S.G. and E.R. to a hotel in Arkansas and engaged in sexual acts with them. No other minors were present. While living in Oman, Mr. Watts was informed by the Oman police of a warrant for his arrest from the U.S. Marshal's. He immediately turned himself in to the Oman Police and was extradited back to

the U.S. On January 28, 2014, Mr. Watts was interviewed by law enforcement and admitted to the conduct of the offense of conviction.

## LAW AND ANALYSIS

Since 2005, the guidelines have been considered advisory, and are now just one of several criteria a sentencing court considers when imposing a sentence. *United States v. Booker,* 543 U.S. 220, 223 (2005). The process a sentencing court must follow since *Booker* involves three steps; first, it must determine the appropriate advisory sentencing range, then examine the propriety of a traditional departure under the guidelines, and finally consider the factors set forth in 18 U.S.C. § 3553(a) to determine whether to vary from the guidelines. *See U.S. v. Garlewicz,* 493 F.3d 933, 937 (8th Cir. (2007).

### A. Determination of Advisory Guideline Range

As the final presentence report is yet to be filed, Mr. Watts maintains his objections to the initial report identified in Document 18.

### B. Applicability of Traditional Departure

Mr. Watts is not seeking any traditional departure.

### C. Application of § 3553(a) Factors to Determine if a Variance is Warranted

18 U.S.C. § 3553(a) is entitled "Factors to be considered in imposing a sentence," and begins with the mandate that:

> "The court shall impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Emphasis added.

In deciding on an appropriate sentence, the court should consider the nature and circumstances of the offense, and the history and characteristics of the defendant. It should also consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law,

and to provide just punishment. In addition, the court should also consider whether or not the sentence would provide adequate deterrence and protect the public from further crimes of the defendant. Along with a consideration of the advisory guideline range, the court should also contemplate the need for the sentence imposed to provide the defendant with medical treatment, vocational training, education, or correctional treatment. The court should also address the need for the sentence imposed to avoid unwarranted sentencing disparities. Each of these purposes can be satisfied with regard to Mr. Watts with a sentence of 45 years.

1. **Nature and Circumstances of the Offense**

Mr. Watts's actions in engaging in sex acts with multiple minors is a terrible offense. Mr. Watts has recognized that his actions can have a long lasting effect on the minors and their families. In a letter written by Mr. Watts, he recognizes that he has had an attraction to young boys since his adolescence, and is a self-identified "pedophile." This is a mental health disease that stems from Mr. Watts own abuse as a young boy. Mr. Watts understands that this is not an excuse to his actions, and that he was the adult during these offenses and should have known better.

While Mr. Watts knows he must be punished for his acts, a sentence of life would be greater than necessary to achieve the goals of punishment. Although his actions are shameful, Mr. Watts did not engage in actual force or violence. That is to say that he did not forcibly commit these offenses with violence, threats of violence, or by holding the minors against their will. When a minor declined Mr. Watts' advances or request, he complied and did not press the issue. Moreover, Mr. Watts did not film any of the acts, he did not produce visual depictions, he does not have a collection of child pornography, nor did he distribute any images.

Moreover, while Mr. Watts did engage in this conduct while he was in the care of the minors, Mr. Watts submits that his role and acts was not solely for the purpose to lure the minors

to engage in sexual acts.  Mr. Watts legitimately viewed the minors as close friends and brothers, and wanted to help provide the boys with anything he could, money, clothes, etc.

**2. History and Characteristics of the Defendant**

Mr. Watts was born in San Bernardino, California.  As noted throughout his PSI, he had an extremely difficult childhood.  His biological father was physically and emotionally abusive to his mother in front of him.  He was also part of a biker gang and was involved in drug dealing.  He abandoned the family when Mr. Watts was approximately 6 years old.  His mother remarried a man name Richard Fuller.  Mr. Watts reported good and bad experiences with Mr. Fuller.  On the one hand, Mr. Fuller was a positive father figure for him, teaching him to shoot, hunt, and survive in the woods.  On the other hand, Mr. Fuller was a strict authoritarian who would ridicule Mr. Watts for having a speech stutter, and would discipline by slapping him in the face.  Mr. Watts recalled one incident when he was young wherein Mr. Watts found baby birds that had fallen from a nest.  He brought them home but Mr. Fuller forced Mr. Watts to kill the baby birds with a hatchet.

When Mr. Watts was approximately 5 years old he was sexually abused by his aunt.  His aunt would babysit him at times while living in California.  During the abuse, his aunt French kissed him, fondled his penis, and performed oral sex on him.  She also had Mr. Watts fondle her breasts and would position him to lay or stand in particular positions during the molestation.  A few years later, when Mr. Watts was about 8 or 9 years old, an unknown adult male molested him.  Mr. Watts remembers being in the nurse's station at school when a male had him in the corner, ordered him to take his pants off, and the male fondled his penis.  Mr. Watts recalls that being touched felt good, but that he also felt embarrassed and scared that he enjoyed it.  As noted in Dr. Wallace's report, Mr. Watts also engaged in sexual acts with his siblings at a young age.

Since early in his youth, Mr. Watts remembers being sexually attracted to males. It wasn't until his senior year in high school that he began realizing he had an attraction to boys several years younger than him. This realization has constantly plagued Mr. Watts to this day. He has battled these urges while also ultimately succumbing to them. He joined the Navy at age 19 to serve his country and put distance between himself and minors. During his time in the Navy Mr. Watts earned sharpshooter award, marksman rifle award, and overseas service ribbon. He also trained with the Navy Seals but did not complete his training due to injury.

During his early adult hood he attempted to engage in normal heterosexual relationships as reported by Dr. Wallace, but he could not dispel his attraction to younger boys. While he had these attractions while employed with youth sports and cub scouts, he never acted on them during his early adult hood. At one point he confided to his family about his attraction to younger boys. He was simply told not to act on those impulses. Mr. Watts began trying to take different herbal supplements to curb his desires. He also sought support in an online support group "Boychat.com." As stated by the forum, "BoyChat is meant to be a supportive, safe, creative and fun forum for boy lovers to discuss their thoughts and feelings, sometimes not even related to boy love." See Exhibit B attached. Included in their rules for posting, the cite does not allow posting of erotica or overly-detailed sexual discussions, no requests, offers, or posting links to illegal material, no advocating or counseling sex with minors, no discussing illegal activities, and not requesting meetings with posters under the age of 18. *Id*.

Mr. Watts' first true homosexual experience came at the age of 24 with a 16 year old boy. After that experience, Mr. Watts had a relationship with a 13 year old boy in Bosnia. While Mr. Watts recognizes that this relationship is inappropriate, he did report that he fell in love with the minor. Moreover, as identified in Dr. Wallace's report, he never forced himself on any minor, he

never asked minors to touch him, he never was involved with child pornography, and when he was told "no" he respected that answer and did not engage in any conduct.

After Mr. Watts' time in the Navy, he became employed as a Corrections Officer in San Antonio, Texas. He was then employed as a jailer with the Bexar County Sheriff's Office in San Antonio, Texas. After his time there, Mr. Watts continued his public service employment at 3-H Wilderness camp for violent juvenile offenders. While his initial presentence report includes an arrest for an altercation with an individual attending the camp, PSI ¶ 140, Mr. Watts denies the description of events. Mr. Watts came across the individual choking and attacking a smaller, weaker person. Mr. Watts instructed Lowe to release the other person but Lowe refused and continued choking the other person. Mr. Watts intervened to break up the fight, and Lowe began attacking Mr. Watts. Mr. Watts then defended himself, but never choked or gouged Lowe's eyes.

Mr. Watts was then employed as a force protection specialist in Bosnia from 2001 to 2002. He provided security at Forward Operating Base Conner where U.S. Army was located, and monitored security checkpoints as people entered the base. While in Bosnia, Mr. Watts was exposed to violence. One instance that he recalled involved an exploded mine. Mr. Watts was sitting outside his residence when an explosion occurred near him, knocking him to the ground. Mr. Watts recovered and saw smoke from the explosion across the street. He responded to the explosion and discovered a female that had stepped on a landmine. The explosion had destroyed one side of her body and her eye. Mr. Watts rendered first aid, but she ultimately died of her wounds. Mr. Watts also saw mass graves of deceased people in Bosnia.

Mr. Watts was also employed as a police officer in the Republic of Marshall Islands from 2004 to 2008. Mr. Watts' was technically terminated due to missing ammunition, but the department also suspected that Mr. Watts was engaging in sexual acts with minor boys. During

his time in the RMI, Mr. Watts befriended several young boys and their families. He admittedly succumbed to his attractions and engaged in sexual contact with minor boys in the RMI. Mr. Watts also helped several of the boys and their families in facilitating the boys travel to the United States to be with other family members in the U.S.

After his time in the RMI, Mr. Watts was employed in Iraq with Combat Support Associates. He aided in the support, training, and force protection for U.S. troops and allied forces. In 2009, Mr. Watts began employment with DynCorp in Afghanistan as a security supervisor. From 2009 to 2012, he was a team leader of biometric automated tools set. This was a database collecting information of people entering the Forward Operating Base Pasab and Camp Leatherneck. Utilizing this software, Mr. Watts and his team actually caught several terrorists attempting to enter the base under false identification who were attempting to attack the base.

While in Afghanistan he also worked in force protection where he worked security. Mr. Watts was also exposed to violence in Afghanistan. During his employment in 2011 an improvised explosive device exploded near Mr. Watts, and shrapnel damaged his left cheek, leg, and ruptured his ear drum. Mr. Watts still has shrapnel in his body and ringing in his ears. In another incident, Mr. Watts recalled a time when a rocket hit a common area of his compound. Mr. Watts was one of the first responders and provided triage and first aid to multiple wounded.

In addition to his military training and experience, Mr. Watts is a high school graduate. He completed training at Texas A & M Engineering Extension Service and is a certified Unexploded Ordinance Remediation and Abatement Technician. Mr. Watts has three prior convictions for engaging in sexual conduct with 2 other minors as reported in the PSI ¶ 135-137. Two of those convictions involve his own nephew for acts that occurred in different Texas counties. While Mr.

Watts did engage in this conduct, he denies the allegations that he had been engaging in sexual acts with his nephew since the age of 5.

Mr. Watts is aware of his attraction to younger boys. It is something he has struggled with almost his entire life. Dr. Wallace has diagnosed Mr. Watts with Pedophilic Disorder. However, it should be noted that this is a mental health disorder. Additionally, as noted by Dr. Wallace, "the disordered behavior of acting on the arousal is subject to change over time with and without intervention." Exhibit A at pg. 11. Essentially, Mr. Watts can be rehabilitated with treatment over time.

### 3. Adequate Deterrence; Protection of the Public

Forty-five years is a deterrent to Mr. Watts. Mr. Watts is not even eligible for parole in Texas for approximately 20 years. He will be monitored in a prison, away from the general public, for the remainder of his life. He will not have access to minors, and he will be deterred from committing similar crimes. Moreover, a sentence to 45 years is a powerful message that will deter others from engaging in similar conduct.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes Mr. Watts may commit, this Court should consider the statistically low risk of recidivism presented by Mr. Watts as noted by Dr. Wallace, in addition to the possibility of rehabilitation for his disorder. The requested sentence will serve not only as a punishment and deterrence to Mr. Watts and others, but also as a message that people with this type of disorder can be given a chance to rehabilitate, and a possibility of returning to being a productive member of society, as opposed to a sentence assuring death in prison.

4.  **Medical Treatment, Vocational Training, Education, or Correctional Treatment**

With the suggested sentence of 45 years, Mr. Watts will have sufficient time to address these sentencing purposes. Mr. Watts will use this time to address his mental health, as well as exploring the reasons that motivated him committing this offense. He will have access to counseling and treatment programs designed to change his behavior and reduce criminality and recidivism. Specifically, Mr. Watts will pursue an exceptional program in the state of Texas, the Sex Offender Treatment Program. It consists of an 18 month intensive treatment program to reduce the rate of re-offense.[1] This time will also afford Mr. Watts the opportunity to continue treatment for his Post Traumatic Stress Disorder.

5.  **Respect for the law; Provide Just Punishment**

A sentence to 45 years for Mr. Watts is just and demonstrates respect for the law. He is 41 years old and will spend majority of his remaining life in a state and federal prison. During that time his mother will have passed away. The earliest age he will be eligible for release on his state charges will be around 61 years old. A sentence to 45 years sends a clear message to the public, and Mr. Watts, that consequences of committing these acts and breaking the law are extremely severe. Under the circumstances of this case, the sentence requested is reasonable and just.

6.  **Need to Avoid Unwarranted Sentenced Disparities**

After a balancing of the § 3553(a) factors, a sentence of 45 years imprisonment would not result in an unwarranted sentencing disparity. While Mr. Watts recognizes that each case is unique, and that many cases can be distinguished from his, he submits the following cases as a guide for the Court. In *Madkins v. United States*, 3:08CR00343-MMH, 2014 WL 4417849 (M.D. Florida Sept. 8, 2014), the defendant was charged with two counts of transporting a minor for commercial

---

[1] Information available at https://www.tdcj.texas.gov/divisions/rpd/rpd_sorp.html

sex acts through the use of force, fraud, or coercion in violation of 18 U.S.C. §1591, one count of transporting a minor with the intent to have the minor engage in prostitution under 18 U.S.C. §2423(a), and one count of possession of a firearm in furtherance of a violation of 18 U.S.C. §1591 under 18 U.S.C. §924(c)(1)(A).  *Madkins*, 2014 WL 4417849 at *1.  At trial, two minor victims, A.L. who was 16 years old and M.M. who was 15 years old, testified that the defendant began socializing with them and providing them marijuana.  *Id*.  The defendant convinced them to run away from home with him.  The defendant introduced them to prostitution, teaching them how to make money by selling sex, lie about their ages, what sex acts to preform, use fake names, and the defendant took part of their earnings for himself.  *Id*. at *2.

The defendant was abusive toward the minors as well.  The minors testified that the defendant forced them to have sex with clients against their will, held them against their will, chocked one minor and pushed her to the ground, prevented them from seeking medical attention, and engaged in sex with both of them.  *Id*. at *3.  At trial, the government presented evidence that the defendant attempted to suborn perjury by contacting a friend requesting that the friend reach out to A.L. to get her to change her testimony.  *Id*.  The jury convicted the defendant for both counts of transporting a minor for commercial sex acts through the use of force, fraud, or coercion, and the count of transporting a minor with the intent to have the minor engage in prostitution.  *Id*. at *4.  After several enhancements including unduly influencing the minors, obstruction of justice, and a career offender enhancement for priors including aggravated robbery, conspiracy to commit aggravated escape, and abduction, the guideline recommended life in prison.  *Id*; 3:08CR00343 Doc. 76.  While the District Court stated that the defendant may have deserved a life sentence based on his manipulative and predatorial conduct toward the minors, his criminal history and his

attempt to suborn perjury, it imposed a 50 year sentence on all counts to run concurrently. *Id.* at *4, 3:08CR00343 Doc. 81.

In *United States v. Smith*, 1:12CR00246 (N.D. Illinois, August 5, 2014), the defendant was initially charged with one count of transporting a minor in interstate commerce for sex trafficking under 18 U.S.C. § 2423(a), two counts of sex trafficking of a minor, and two counts of sex trafficking by force. Doc. 3. Although the defendant pled guilty to only one count of transporting a minor with intent that the minor engage in prostitution, Doc. 36, his conduct involved four young women, two of them 17 year old minors. The defendant forced them into prostitution using threats of death, physical beatings, and forcible sex acts. Doc. 62. While the guidelines recommended life imprisonment, the Court ultimately sentenced the defendant to 360 months. Doc. 84.

In *United States v. Rivera*, 5:15CR50061 (W.D. Ark. March 29, 2016), this Court was presented with a defendant somewhat similar to Mr. Watts. The defendant in Rivera was initially charged with two counts of production of child pornography, and one count of possession of child pornography. While Mr. Rivera pled guilty one production of child pornography offense and one possession of child pornography offense, the totality of his conduct involved sexual acts with minor females as young as 4 years old to 14 years old. The defendant had many videos of himself masturbating in front of minors, flashing his genitals to minors, touching minor females under clothes, filming minors walking, and engaging in sexual conduct with several minors.

The conduct that led to the defendant finally being apprehended involved an alleged attempted kidnapping of a minor girl where the defendant allegedly grabbed a 13 year old female by force, and the female reported that the defendant put his arm around her throat and grabbed her between the legs. Although there were only three "hands on victims" in that case, the defendant

was linked to approximately 33 victims. The Court sentenced the defendant to the statutory maximum on both counts for a total sentence of 600 months.

While counsel recognizes that these are not perfect comparisons, the defendants in these cases are somewhat similar to Mr. Watts. Although the *Madkins* case involved only 2 minor victims, as opposed the multiple victims associated with Mr. Watts, the defendant in *Madkins* and the defendant in *Smith* engaged in much more violent conduct. Not only did they engage in sexual acts with the minors, but they forced them into prostitution and physically and emotionally abused his victims. That defendant in *Madkins* was also a career offender in a higher criminal history category and with a much more violent past than Mr. Watts.

Additionally, while the defendant in *Rivera* was subject to different offenses, his history demonstrated a sexual attraction to younger minors. Conversely, the defendant in *Rivera* had a history of victimizing substantially more minors than Mr. Watts. A sentence to 540 months would punish Mr. Watts similar to other defendants and would avoid unwarranted sentencing disparities.

## CONCLUSION

When applying the § 3553(a) factors the sentence requested is sufficient but not greater than necessary to achieve the goals of sentencing.

WHEREFORE, Mr. Watts respectfully requests this Court impose a sentence of a total of 540 months imprisonment to run concurrently with his state sentences.

                                      Respectfully submitted,

                                      BRUCE D. EDDY
                                      FEDERAL PUBLIC DEFENDER
                                      WESTERN DISTRICT OF ARKANSAS

                    By:     /s/ *Joe Alfaro*_____
                                      Joe Alfaro
                                      Assistant Federal Public Defender
                                      3739 N. Steele Blvd., Suite 280

Fayetteville, AR 72703<br>
(479) 442-2306

**CERTIFICATE OF SERVICE**

      I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Dustin Roberts, AUSA, Trent Thompson, U.S. Probation Officer, and I hereby certify that I delivered a copy to the following non CM/ECF participants: none.

/s/ *Joe Alfaro* _____
Joe Alfaro
Assistant Federal Public Defender